UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **CATHARINE CADIGAN,**<br>    **Plaintiff**<br><br>v.<br><br>**GENESIS ELDERCARE PHYSICIAN SERVICES, INC., d/b/a GENESIS PHYSICIAN SERVICES,**<br><br>and<br><br>**GENESIS ADMINISTRATIVE SERVICES, LLC,**<br>    **Defendants** | Docket No:_____<br><br>**COMPLAINT AND JURY TRIAL DEMAND** |

NOW COMES Catharine Cadigan, M.D. ("Dr. Cadigan"), by and through her counsel, Norman, Hanson & DeTroy, LLC, and complains as follows:

1. The Plaintiff, Dr. Cadigan, is a physician licensed to practice in the State of Maine by the Maine Board of Licensure in Medicine.

2. Genesis Healthcare, Inc. ("Genesis Healthcare") is a holding company with subsidiaries that, on a combined basis, comprise one of the nation's largest post-acute care providers with nearly 250 skilled nursing centers and senior living communities in 22 states nationwide.

1

3. Genesis Eldercare Physician Services, Inc., d/b/a Genesis Physician Services (hereinafter "GPS") is a business corporation organized under the laws of the State of Delaware, which is affiliated with Genesis Healthcare and which provides clinical, administrative and practice management oversight within Genesis Healthcare's centers.

4. Defendant Genesis Administrative Services, LLC (hereinafter "Genesis Administrative Services"), is a limited liability company organized under the laws of the State of Delaware, which is affiliated with Genesis Healthcare.

5. This Court has jurisdiction of the various claims asserted in this action pursuant to 28 U.S.C §§1331, 1332, and 1367.

6. Venue is proper in the District of Maine, where a substantial part of the events giving rise to the claim occurred and where the Defendants are subject to the Court's personal jurisdiction.

### Dr. Cadigan's Hiring

7. Dr. Cadigan became employed by GPS in January 2021.

8. When Dr. Cadigan was hired by GPS, their agreement was that she would serve as the Medical Director of two Genesis Healthcare centers, Sandy River in Farmington and Cedar Ridge in Skowhegan, spending two days per week at each facility.

9. Rules issued by the Centers for Medicare and Medicaid Services (CMS), 42 CFR §§483.30(c)(3) and 483.40(c)(1), require that residents in nursing facilities (NFs) and skilled nursing facilities (SNFs) be seen by physicians or mid-level providers,

who may be nurse practitioners, at specified intervals. These periodic visits are colloquially referred to as "regulatory visits."

10. Compliance with 42 CFR §§483.30(c)(3) and 483.40(c)(1) is a condition of payment by Medicare and Medicaid.

11. When Dr. Cadigan was hired by GPS, she was assigned to work as the Medical Director of Sandy River and Cedar Ridge, and handle both (i) admissions of new patients and (ii) regulatory visits.

### The Change in Dr. Cadigan's Responsibilities

12. On June 14, 2021, GPS assigned Dr. Cadigan responsibility for three additional sites:

    - RiverRidge Center in Kennebunk, a 50-bed facility with between 10 and 14 skilled nursing patients.

    - Marshwood Center in Lewiston, a 90-beds facility with between 15 and 20 skilled nursing patients.

    - Windward Gardens in Camden, a 50-bed facility with between 10 and 15 skilled nursing patients.

    For a time, she also covered a sixth, 40-bed facility, Harbor Hill in Belfast.

13. In June 2021, when Dr. Cadigan assumed responsibility for RiverRidge, Marshwood, and Windward Gardens, she was relieved of responsibility for the regulatory visits, which was reassigned to advanced practice practitioners

("APPs"). In a meeting attended by Dr. Cadigan's superiors and the APPS, it was unanimously agreed that the APPs would assume this new responsibility.

14. The APPs did not, however, fulfill the obligation to evaluate patients with the frequency specified by 42 CFR §§483.30(c)(3) and 483.40(c)(1).

15. Because the APPs failed to carry out the functions required by federal law, it was not uncommon for Dr. Cadigan to find that patients in Genesis Healthcare facilities had not had the benefit of medical evaluations for months on end.

16. Furthermore, Dr. Cadigan became aware through her experience working in multiple Genesis Healthcare facilities that the APPs in those facilities were inadequately trained.

17. Dr. Cadigan informed her immediate superior, Dr. Lawrence Smith ("Dr. Smith"), that the APPs were were not fulfilling their responsibility for completing regulatory visits.

18. On or about July 16, 2021, Dr. Cadigan sent Dr. Smith a text message in which she said:

> **This job makes me really uncomfortable. The legal jeopardy I have put myself in covering six facilities with the type of APP structure in place is staggering. I did not appreciate how dire this was when I said yes.**

19. Dr. Smith and his colleagues in GPS management understood that the APPs' failure to complete the mandated regulatory visits resulted in the submission of

Medicare and Medicaid claims for which a condition of payment had not been satisfied.

20. Dr. Cadigan also informed GPS leadership that the APPs were inadequately trained, and that their lack of training posed a risk to patients.

21. On October 27, 2021, Dr. Cadigan wrote in an email to Louise Dias, PA-C, GPS's "Northeast Area Clinical Practice Manager," that in her experience the hiring of new nursing school graduates as APPs had not been successful in Genesis Healthcare facilities. Dr. Cadigan told Ms. Dias that several APPs "felt the initial training inadequate, [and] further training and support largely absent." As a result, they had been forced to "figure important things out on their own," which they found "scary."

22. By this communication, among others, Dr. Cadigan conveyed to her superiors that residents of Genesis Healthcare centers were not receiving care consistent with the standard of patient care, and that they were being exposed to the risk of serious harm.

### The Further Expansion of Dr. Cadigan's Job Responsibilities

23. In January 2022, Genesis Healthcare acquired Sedgewood Commons, a 90-bed memory care facility in Falmouth with 10 skilled nursing beds, and assigned Dr. Cadigan responsibility for that site as well.

24. In January 2022, when Dr. Cadigan was assigned responsibility for Sedgewood Commons, Dr. Smith gave her permission to perform her duties for the Marshwood facility entirely at home, via telehealth, if she wished.

25. Once Dr. Cadigan had been assigned responsibility for RiverRidge, Marshwood, Windward Gardens, and Sedgewood Commons, she identified, and she reported to her superiors, further evidence that the facilities were inadequately staffed and managed. The deficiencies included the following:

    - RiverRidge needed a full-time Nurse Practitioner, but it had only a single Nurse Practitioner who worked there two days per week, and shared responsibility for two other facilities (Marshwood and Sedgewood).
    - RiverRidge, a facility for brain-injured patients, lacked an APP with training in the care of brain-injured patients.
    - Sedgewood Commons had no Director of Nursing through January and February, and it had only a single inexperienced, untrained Nurse Practitioner.
    - The Nurse Practitioner at Windward Gardens also routinely had a backlog of fifty (50) or more visits for which she had created no notes.

26. In early 2022, Dr. Cadigan continued to report to her supervisors her concern about the inadequate training of the Nurse Practitioner at Sedgewood Commons. For example, in February of 2022 Dr. Cadigan informed her superiors that one practitioner had 89 unsigned notes – in other words, a single practitioner had failed to finalize and sign clinical notes, as required, for 89 separate patient encounters.

27. The APPs' failure to complete their charting responsibilities posed a significant obstacle to patient care. Without the APPs' notes, there was no way for Dr. Cadigan – or, for that matter, any member of the health care team – to be apprised of what their assessments were, or the rationale for patients' plans of care. This, in turn, interfered with the coordination of care necessary for medically complex patients.

28. Through these communications, Dr. Cadigan reinforced for her superiors her concern that residents of Genesis Healthcare centers were not receiving care consistent with the standard of patient care, and that they were being exposed to the risk of serious harm.

## The Investigation of Dr. Cadigan

29. On March 8, 2022, Dr. Cadigan saw fifteen (15) patients.

30. On days she was expected to see patients at Sedgewood Commons, Dr. Cadigan's routine practice was to start her day at approximately 7:00 a.m., work at home on notes until approximately 12:30 p.m., and then drive to the facility

31. On March 8, 2022, Dr. Cadigan arrived at Sedgewood Commons at 1 p.m., and departed the site at 3:15 p.m.

32. While at Sedgewood Commons, Dr. Cadigan spent approximately 30 minutes conferring with the Nurse Practitioner on site about patients, and the rest of her time seeing patients.

33. Because Dr. Cadigan had no access to a usable computer at Sedgewood Commons, she then went home and finished her workday there.

34. Dr. Cadigan's routine practice was to continue working at home after seeing patients, finalizing her notes and talking with patients' families.

35. The "audit log" tracking Dr. Cadigan's access to the Genesis electronic medical record (EMR) reveals that on March 8, 2022, she first logged on to the EMR at 7:50 a.m. and logged off at 8:50 p.m.

36. Dr. Cadigan believes, and therefore alleges, that on March 8, 2022 she worked a total of more than twelve (12) hours, including time spent on chart review, conferring with the Nurse Practitioner at Sedgewood Commons, seeing patients, and finalizing notes.

37. In the notes she made of her patient encounters, Dr. Cadigan wrote that she spent time "on chart review, discussion with staff and bedside evaluation."

38. During the COVID crisis, with staff shortages due to illness and other matters, electronic communication was often the best, if not the only, way for Dr. Cadigan to communicate with staff. It was often impossible for her to find staff when she came on site, and when she was able to find a staff member, they often were unfamiliar with the patients and could not answer her questions.

39. On or about March 9, 2022, GPS initiated an investigation of Dr. Cadigan, in the course of which GPS accused her of falsifying medical records.

40. In the record of an interview with Dr. Cadigan around billing and documentation issues, conducted on March 15, 2022, Genesis investigators noted that Cadigan "brought up [the] APP who [was] 100 notes behind."

## The Revocation of Dr. Cadigan's Privileges and the Termination of Her Employment

41. On March 28, 2022, Defendant GPS terminated Dr. Cadigan's employment.

42. The stated reasons for the termination were that:

    a. The date of service reflected in [her] documentation (for alleged services performed on 3/13/2022) was incorrect.

    b. The documentation from the 3/8/2022 patient visits, stating that [she] spoke with center staff, has been substantiated as false per interviews conducted with center staff.

    c. [Her] practice of preloading documentation prior to the date of the visit – has created a number of patient visits that were billed using an incorrect date of service.

    d. Documented time spent per visit on the date of service [was] inaccurate due to [her] acknowledgment of combining time spent from day(s) other than the date of the patient visit.

43. On March 28, 2022, Defendant Genesis Administrative Services sent a letter to Dr. Cadigan, informing her that her credentials at Marshwood Center, RiverRidge Center, Sedgewood Commons, and Windward Gardens were revoked as of that date "due to the findings of a compliance investigation," and that she would "not [be] eligible to apply for credentials at any Genesis Center in the future."

44. The letter from Genesis Administrative Services to Dr. Cadigan, which imputed dishonesty or incompetence, was copied to the Executive Directors of Marshwood Center, RiverRidge Center, Sedgewood Commons, and Windward Gardens.

45. The reasons given for Dr. Cadigan's termination were false and pretextual.

46. In fact, the documentation errors identified in Paragraph 42, sub-paragraphs (a), (c), and (d), all stemmed from the fact that, in order to do her job, Dr. Cadigan had to "pre-load" patient charts with clinical data she carried over from previous encounters.

47. As Dr. Cadigan explained to the GPS investigators:

    a. Because she was responsible for several facilities and hundreds of patients, there was not enough time in any given workday for her to update/populate the charts of the patients she needed to see, *then* see those patients, and *then* still perform all the administrative chores expected of her;

    b. Her only hope of accomplishing the demands of her job was to pre-load charts at night, on weekends, and in the early morning hours, in anticipation of upcoming patient encounters;

    c. Accordingly, she had no choice but to pre-load charts.

48. Furthermore, there is no doubt that GPS (i) understood its clinicians were pre-loading charts, (ii) condoned the practice, and (iii) recognized the errors that could result from the practice.

49. In an email dated April 1, 2022, three days *after* Dr. Cadigan's termination, Carolyn Blackman, a GPS Senior Vice President for Medical Affairs, explained that:

    a. In the electronic medical record system GPS had recently updated (referred to in the email chain as "new gEHRimed"), "providers can select *all* dates both before and after today allowing for work to be *both* done *after the fact* and *prepared in advance*." In other words, they can "pre-load" patient charts.

    b. It is also possible to change or "reassign" the date of the chart entry.

50. The functionality described in Carolyn Blackman's email of April 1, 2022, which permitted users to change or "reassign" the date of a chart entry, was new – during Dr. Cadigan's employment, it had not been possible to change the date of the visit at the time of documentation in the gEHRimed electronic record.

51. Dr. Cadigan had reported the challenges associated with the gEHRimed electronic record – specifically, her inability to adjust the date of a visit after pre-loading a chart – to her leadership, including Denise Spataro (Vice President of Performance Management), Caroline Blackman (Senior Vice President for Medical Affairs), and Lawrence Smith, M.D. (Regional Medical Director), and all had characterized it as an unimportant glitch in the system.

52. Because (i) GPS knew that Dr. Cadigan had no choice but to pre-load charts, (ii) the pre-loading of charts was common practice among Genesis physicians, (iii) Genesis knew its physicians pre-loaded charts, and approved the practice, and (iv)

11

Genesis knew that the pre-loading of charts created confusion with respect to dates of service and billing, the company's professed concern about pre-loading charts was and is not a credible, legitimate reason for terminating Dr. Cadigan's employment, revoking her credentials, and communicating to staff that the revocation of her credentials was due to dishonesty or incompetence.

53. The real reason Dr. Cadigan was fired, and her credentials were revoked, was that she had objected, and she continued to object, to (i) Genesis's violations of federal law, (ii) the company's failure to provide the training necessary to ensure that its APPs were capable of caring competently for patients, and (iii) the company's failure to correct systemic inadequacies in care, including the failure of its APPs to complete charting on patients.

54. The pretextual character of the reasons given for Dr. Cadigan's firing is highlighted by the fact that GPS falsely claimed, in a submission to the Maine Human Rights Commission, that she never had "report[ed] any unsafe or illegal conditions in the workplace."

55. GPS made this false representation to the Maine Human Rights Commission, despite knowing that Dr. Cadigan had told her immediate superior, Dr. Lawrence Smith, that was afraid she had put herself in "staggering" "legal jeopardy"?

56. When it fired Dr. Cadigan, Defendant GPS knew that as a matter of law, the termination, and the false reasons given for it, would have to be reported to the Maine Board of Licensure in Medicine (BOLIM).

57. When it revoked Dr. Cadigan's credentials, Defendant Genesis Administrative Services knew that as a matter of law, the revocation, and the reasons given for it, would have to be reported to the Maine Board of Licensure in Medicine (BOLIM).

58. When it fired Dr. Cadigan, Defendant GPS knew that, once the reasons for Dr. Cadigan's firing were reported, the BOLIM would initiate a complaint against Dr. Cadigan.

59. When it revoked Dr. Cadigan's credentials, Defendant Genesis Administrative Services knew that, once the reasons for the revocation were reported, the BOLIM would initiate a complaint against Dr. Cadigan.

60. The BOLIM did initiate a complaint against Dr. Cadigan.

61. As a result of her termination and the revocation of her privileges, and the ensuing reports to the BOLIM, Dr. Cadigan has been forced to incur legal fees and expenses to protect her license to practice medicine.

62. When it fired Dr. Cadigan, Genesis knew that Dr. Cadigan would be required to tell future employers the reasons Genesis had given for firing her.

63. Dr. Cadigan has in fact been required to tell her current employer the reasons GPS gave for firing her.

64. The pendency of the unresolved BOLIM complaint has made it impossible for Dr. Cadigan to get a new job with pay, benefits, and professional satisfaction commensurate to the pay, benefits, and professional satisfaction she enjoyed while employed by Genesis.

65. The termination of Dr. Cadigan's employment has prevented her from achieving certification in Medical Direction from the American Medical Directors Association.

66. The termination of Dr. Cadigan's employment has prevented her from realizing her professional goal of working as a Medical Director of a skilled nursing facility.

## **COUNT I**

67. The Plaintiff repeats and realleges the facts set forth above, as though set forth in full herein.

68. The False Claims Act's anti-retaliation provision, 31 U.S.C.A. § 3730(h), provides in part:

> (1) In general.--Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

> (2) Relief.--Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

58. The conduct of GPS and Genesis Administrative Services, described above, was all in retaliation for conduct by Dr. Cadigan that was protected under the False Claims Act, and it was meant to prevent Dr. Cadigan from continuing to engage in that protected conduct.

WHEREFORE, Dr. Cadigan prays for the following relief:

   a. Compensation for all damages she has suffered as a result of the retaliatory and discriminatory conduct by Defendants GPS and Genesis Administrative Services, including but not limited to 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees; and

   b. Such further relief as the Court deems just in the circumstances.

## COUNT II

59. The Plaintiff repeats and realleges the facts set forth above, as though set forth in full herein.

60. The conduct of GPS and Genesis Administrative Services, described above, violated the Maine Whistleblowers Protection Act, 26 M.R.S.A. 833 (1)(A), because it was in retaliation for Dr. Cadigan's reporting in good faith what she had reasonable cause to believe were practices that put at risk the health and safety of Genesis patients.

61. The conduct of GPS and Genesis Administrative Services, described above, violated the Maine Whistleblowers Protection Act, 26 M.R.S.A. 833 (1)(E),

because it was in retaliation for her reporting what she had reasonable cause to believe were practices that constituted deviations from the standard of patient care.

62. Genesis's violation of the Maine Whistleblowers Protection Act was malicious.

WHEREFORE, Dr. Cadigan prays for judgment awarding the following relief:

a. Compensatory damages in an amount sufficient to compensate her for her lost income, her emotional distress, and her consequential economic injury;

b. Punitive damages in an amount sufficient to deter these Defendants and others from engaging in similar conduct;

c. A reasonable attorneys' fee; and

d. Her costs of court.

## COUNT III

63. The Plaintiff repeats and realleges the facts set forth above, as though set forth in full herein.

64. When issuing Dr. Cadigan's final paycheck, GPS improperly deducted $38,000 because, according to GPS, she had not fully earned a sign-on bonus and a retention bonus that had been paid to her.

65. The failure of GPS to pay Dr. Cadigan in full upon the cessation of her employment violated 26 M.R.S.A. §626.

WHEREFORE, Dr. Cadigan demands judgment in the full amount allowed by 26 M.R.S.A. §626-A, including her unpaid wages together with a reasonable rate of interest,

costs of suit including a reasonable attorney's fee, and an additional amount equal to twice the amount of unpaid wages as liquidated damages.

## **COUNT IV**

66. The Plaintiff repeats and realleges the facts set forth above, as though set forth in full herein.

67. From June 2021, when she was first assigned responsibility to act as the Medical Director of three facilities that were not within the scope of her original contract, through March of 2022, Dr. Cadigan rendered additional services, above and beyond those contemplated by her express written contract.

68. Genesis knew that Dr. Cadigan was providing services which were not within the scope of her express written contract, and Genesis consented to her performing those additional services.

69. It was and is reasonable for Dr. Cadigan to expect payment for the additional services she performed.

WHEREFORE, Dr. Cadigan prays for judgment awarding her compensatory damages in an amount sufficient to compensate her for the value of the services she performed, and her costs of court.

**A JURY TRIAL IS DEMANDED**

Dated at Portland, Maine this 27th day of March, 2024.

/s/ Christopher C. Taintor

Christopher C. Taintor, Esq.
Attorney for Plaintiff

NORMAN, HANSON & DeTROY, LLC
Two Canal Plaza
P.O. Box 4600
Portland, Maine 04112-4600
(207) 774-7000